23 F.3d 1091
 62 USLW 2723
 Cheryl COLEMAN; Gerry Coleman, Plaintiffs-Appellants,
v.
AMERICAN RED CROSS; American Red Cross Blood
Services--Southeastern Michigan Region, Defendants-Appellees,
Paul Lentz, M.D.; Thomas J. Schnitzer, M.D., Defendants.
 No. 93-1130.
 United States Court of Appeals,
Sixth Circuit.
 Argued Nov. 15, 1993.
Decided May 16, 1994.
Rehearing and Suggestion for Rehearing En Banc Denied June
24, 1994.*
 
 Jonas Sniokaitis (argued and briefed), Cummings, McClorey, Davis & Acho, Livonia, MI, for plaintiffs-appellants.
 Daniel G. Wyllie (argued), Margaret A. Costello (briefed), Dykema & Gossett, Detroit, MI, Bruce M. Chadwick, Kathleen A. Behan, Arnold & Porter, Washington, DC, for defendants-appellees.
 Before: GUY and RYAN, Circuit Judges, and CONTIE, Senior Circuit Judge.
 GUY, Circuit Judge, delivered the opinion of the court, in which CONTIE, Senior Circuit Judge, joined. RYAN, Circuit Judge (pp. 13-19), delivered a separate dissenting opinion.
 RALPH B. GUY, Jr., Circuit Judge.
 
 
 1
 Plaintiffs, Cheryl and Gerry Coleman, appeal the district court's dismissal of their negligence action under Federal Rule of Civil Procedure 41(b). The court dismissed their claim against the American Red Cross because it found that they had violated a discovery protective order. The plaintiffs also contend on appeal that the district court erred: (1) in applying the wrong standard to preclude the discovery of relevant information; and (2) in prohibiting the plaintiffs from obtaining discovery of documents located at the Red Cross' national headquarters. For the reasons discussed below, we affirm in part, reverse in part, and remand.
 
 I.
 
 2
 This case is now before us for a third time. See Coleman v. American Red Cross, 979 F.2d 1135 (6th Cir.1992); Coleman v. American Red Cross, No. 91-1421 (6th Cir. Aug. 12, 1991). The issues raised on appeal involve substantially the same events that were outlined in Coleman, 979 F.2d at 1135. Thus, for purposes of this analysis, we only need to briefly summarize the facts.
 
 
 3
 On August 15, 1984, Cheryl Coleman received a blood transfusion at the University of Michigan Hospital. The blood Mrs. Coleman received had been donated to the Red Cross six days earlier. That blood apparently contained the Human Immunodeficiency Virus (HIV), the virus that causes Acquired Immune Deficiency Syndrome (AIDS). Mrs. Coleman's blood tested positive for HIV antibodies in September 1988.
 
 
 4
 The Colemans then filed an action, claiming that the Red Cross was negligent in failing to screen out the infected donor and in failing to test the donor's blood after collecting it. During discovery, the Colemans requested the donor's name and address, but the Red Cross refused to provide this information. Eventually, the district court ordered the Red Cross to furnish the donor's records to the Colemans but with all information that would identify the donor redacted. Coleman v. American Red Cross, 130 F.R.D. 360, 363 (E.D.Mich.1990).
 
 
 5
 The Red Cross subsequently delivered several donor information cards to the Colemans. On one of the cards, the Red Cross inadvertently failed to redact the donor's social security number. The Coleman's attorney immediately hired a private investigator who was able to determine the donor's name and address from information he obtained as a result of having the social security number.
 
 
 6
 When the Red Cross learned of this, it moved for a protective order to prevent the Colemans and their attorney from using this information. The district court ordered the Colemans and their attorney to turn over any documents containing the donor's name and enjoined them from using the information for any purpose, including using the name to bring an action against the donor.
 
 
 7
 The Colemans appealed this order, arguing that the district court erred by enjoining them from suing the donor. We agreed, finding that the district court had abused its discretion by prohibiting the Colemans from bringing a separate proceeding against the donor. Coleman, 979 F.2d at 1141. We remanded to the district court for further proceedings.
 
 
 8
 When the case returned to the district court, the Red Cross filed a motion to dismiss pursuant to Rule 41(b). In support of its motion, the Red Cross claimed that it was substantially prejudiced by the Colemans' intentional violation of the protective order. The district court found that the facts supported this assertion and entered an order to dismiss the complaint. The Colemans then filed this appeal.
 
 II.
 
 9
 Under Rule 41(b) of the Federal Rules of Civil Procedure, when a plaintiff fails to comply with any order of the court, the defendant may move for dismissal of the action.[1] Court orders imposing sanctions under this rule are reviewable only for abuse of discretion. Carter v. City of Memphis, Tenn., 636 F.2d 159, 161 (6th Cir.1980).
 
 
 10
 In the past, we have upheld the use of "dismissals as a sanction for failing to comply with discovery orders because it accomplishes the dual purposes of punishing the offending party and deterring similar misconduct by future litigants." Taylor v. Medtronics, Inc., 861 F.2d 980, 986 (6th Cir.1988) (citations omitted). In response to the argument that a party should not be required to suffer harm for an attorney's derelictions, the Supreme Court stated:
 
 
 11
 There is certainly no merit to the contention that dismissal of petitioner's claim because of his counsel's unexcused conduct imposes an unjust penalty on the client. Petitioner voluntarily chose this attorney as his representative in the action, and he cannot now avoid the consequences of the acts or omissions of this freely selected agent. Any other notion would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer-agent and is considered to have "notice of all facts, notice of which can be charged upon the attorney."
 
 
 12
 Link v. Wabash R.R. Co., 370 U.S. 626, 633-34, 82 S.Ct. 1386, 1390, 8 L.Ed.2d 734 (1962) (citation omitted).
 
 
 13
 Despite the Supreme Court's unequivocal language, this court, like many others, has been extremely reluctant to uphold the dismissal of a case merely to discipline an attorney. Buck v. United States Dep't of Agric., 960 F.2d 603, 608 (6th Cir.1992); Shepard Claims Serv. v. William Darrah & Assoc., 796 F.2d 190, 195 (6th Cir.1986). In Carter we stated that the "dismissal of an action for an attorney's failure to comply is a harsh sanction which the court should order only in extreme situations showing 'a clear record of delay or contumacious conduct by the plaintiff.' " 636 F.2d at 161 (emphasis added) (quoting Silas v. Sears, Roebuck & Co., 586 F.2d 382, 385 (5th Cir.1978)). We also noted in Carter that "[d]ismissal is usually inappropriate where the neglect is solely the fault of the attorney." Id. See also Carver v. Bunch, 946 F.2d 451, 454 (6th Cir.1991); Patton v. Aerojet Ordnance Co., 765 F.2d 604, 607 (6th Cir.1985).
 
 
 14
 In Patterson v. Township of Grand Blanc, 760 F.2d 686, 688 (6th Cir.1985), we reversed a dismissal, adjudging that sanction to be "extremely harsh in that it deprives a plaintiff of his day in court due to the inept actions of his counsel[.]" Patterson relied upon Carter, which reversed a dismissal under Rule 41(b) because, while plaintiff's counsel had been inept, the plaintiff was blameless. We implicitly found that a potential claim against the plaintiff's attorney did not overcome the harm that the plaintiff would suffer from dismissing the action. See also Lolatchy v. Arthur Murray, Inc., 816 F.2d 951 (4th Cir.1987) (reversing a default judgment, over a strong dissent, because the defendants did not contribute to their attorney's dilatory conduct); Carter v. Albert Einstein Medical Cent., 804 F.2d 805 (3d Cir.1986) (reversing a dismissal because the plaintiff did not contribute to the attorney's negligent conduct). Thus, although the Link principle remains valid, see National Hockey League v. Metro. Hockey Club, 427 U.S. 639, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976), we have increasingly emphasized directly sanctioning the delinquent lawyer rather than an innocent client.
 
 
 15
 Here, all of the wrongful conduct must be attributed to counsel; the Colemans did not engage in any culpable conduct themselves. Even the district court itself noted that the "[d]efendants do not claim that plaintiffs participated directly in the investigation which culminated in discovering the identity of the purported donor." (App. 64.) Admittedly, the attorney's actions in this case were more egregious than in the cases previously discussed; however, this does not mandate that the attorney's conduct be imputed to the Colemans.
 
 
 16
 The Red Cross argues that it was substantially prejudiced by the violation of the protective order. Previously, in reversing the district court's order that prohibited the Colemans from suing the donor, we noted that "the district court did not commit error in concluding that donor disclosure could imperil the safety and adequacy of the national blood supply." Coleman, 979 F.2d at 1139. The genesis of this observation, however, was whether or not the court could consider the impact on the blood supply in fashioning its order. In no way did we endorse any substantive finding as to whether donor disclosure would imperil the blood supply. Thus, we now look for the first time to see if the defendants actually were prejudiced when the Colemans learned of the donor's identity.
 
 
 17
 There is no evidence that the Colemans have used, or could use, the donor's identity to directly prejudice the Red Cross insofar as this litigation is concerned. As proof of its having been prejudiced, the Red Cross points to a drop in blood donations, which it attributes to the publicity surrounding our previous decision.[2] This publicity, it claims, spawned fear among the public; fewer people are donating blood because now they fear possible liability. In response, the Colemans noted that even prior to the publication of the supposedly damaging article, Red Cross donations in the Detroit area were reportedly down 11 percent. Even the district court questioned the Red Cross' claim, stating that the Colemans' "argument that further study is needed to ascertain the exact cause or causes for the drop in blood donations has merit." (App. 61.) Similarly, we find that the evidence presented by the Red Cross does not establish a causal connection between the violation of the court's protective order and a decrease in the number of people donating blood.
 
 
 18
 Nevertheless, the district court found that the Red Cross was prejudiced in other ways. The court noted that the original protective order was based upon specific findings that there could be harm to the blood supply if the donor's identity became known to the public. The court also found that the defendants were prejudiced because they complied with the court's order to produce the donor registration cards and did so relying on the court's order to protect documents that they had objected to producing in the first place. Finally, the court noted that any party who complies with a court order to produce necessarily is prejudiced when another party abuses the judicial process to discover protected information.
 
 
 19
 In our opinion, these findings do not establish the type of prejudice that permits the dismissal of this case. There is no disputing that the Colemans' attorney intentionally violated the district court's protective order. Such behavior undermines the authority of the court and the attorney may be sanctioned accordingly; however, unless the Red Cross can articulate how it was prejudiced in this litigation, it was an abuse of discretion to dismiss this case.
 
 
 20
 We note in this regard that the defendants did not seek dismissal as a sanction when plaintiffs' counsel's misconduct was first discovered. Nor did the court, sua sponte, consider such a sanction. The only significant event that occurred in the interim was our decision to reverse the earlier ruling of the district court. It was our decision that generated the news coverage about which the defendant complained to the district court. We do not think the individual plaintiffs should be held accountable for whatever flowed from such coverage, if anything.
 
 We previously stated:
 
 21
 The donor's privacy interests are substantial, as is the public interest in maintaining a safe and adequate blood supply. However, we believe that the Colemans' right to litigate their claims against the donor substantially outweighs the competing interests, especially since there is significant evidence to suggest that the donor's conduct was suspect. Accordingly, we conclude that the district court abused its discretion by enjoining the Colemans from bringing a separate action against the donor.
 
 
 22
 Coleman, 979 F.2d at 1141. Similarly, we find that the Coleman's right to sue the Red Cross outweighs any harm demonstrated by the Red Cross.[3]
 
 III.
 
 23
 The Colemans also raise two issues pertaining to the district court's orders regarding discovery. The Red Cross asserts that this court lacks jurisdiction to review this claim because discovery orders are nonfinal decisions not subject to appeal. The law is well settled that an appeal from a final judgment draws into question all prior non-final rulings and orders. Cattin v. General Motors Corp., 955 F.2d 416, 428 (6th Cir.1992); McLaurin v. Fischer, 768 F.2d 98, 101 (6th Cir.1985). Rule 41(b) of the Federal Rules of Civil Procedure specifically provides: "Unless the court in its order for dismissal otherwise specifies, a dismissal under this subdivision ... operates as an adjudication upon the merits." Moreover, the defendants concede that "the order of dismissal presently on appeal is final because it ends the litigation on the merits[.]" (Defendant's Brief at 41.) Thus, we have jurisdiction to resolve the issues concerning the prior discovery orders.
 
 
 24
 "[I]t is well established that the scope of discovery is within the sound discretion of the trial court." United States v. Guy, 978 F.2d 934, 938 (6th Cir.1992) (citations omitted). Accordingly, we review discovery matters under an abuse of discretion standard. Id. at 939.
 
 
 25
 In their first contention of error, the Colemans argue that the district court improperly applied an "admissibility" standard rather than a "relevance" standard in precluding the discovery of certain information. The information sought to be discovered relates to one of the claims of negligence against the Red Cross: The Red Cross failed to use the hepatitis B core antibody test in screening the blood of the implicated donor.
 
 
 26
 The Colemans note that in a meeting held at the Center For Disease Control on January 4, 1983, it was reported that 90 percent of known AIDS cases were positive for the antibody to the core antigen of the hepatitis B virus (anti-HBc) and would be excluded as blood donors if the presence of hepatitis B core antibody was used as a laboratory surrogate screening test. The anti-HBc test was so successful because hepatitis B is prevalent in the same populations that are at high risk for AIDS.
 
 
 27
 Approximately one year later, the Red Cross' San Jose Region advised headquarters that its Medical Advisory Committee had approved the implementation of hepatitis B core antibody testing. In response, headquarters indicated that the test would not be performed in other regions as there was no evidence that such testing would reduce the number of cases of transfusion-associated AIDS.
 
 
 28
 On June 11, 1984, the Red Cross implemented the test at its San Jose, California, based region. The test, or other surrogate tests, were also being used at other non-Red Cross blood banks. The test was used until the spring of 1985, when a test identifying HIV became available.
 
 
 29
 The Colemans sought data on the number of transfusions associated with AIDS/HIV infections that had been reported in blood recipients that received blood from the San Jose region during the time the hepatitis B core antibody test was being used. The Colemans also inquired into the number of transfusion-associated AIDS/HIV infections from blood products produced by the Southeastern Michigan Region during the same period.
 
 
 30
 The Colemans contend that this information was readily available, as the Red Cross' "Look Back" program was used to identify units of blood that were contaminated with the AIDS virus and had been transfused prior to the implementation of the AIDS testing.
 
 
 31
 The Red Cross objected to this motion on the grounds that it was unduly burdensome and expensive. Counsel for the Red Cross argued that they already had responded to over 300 interrogatories and over 140 separate document requests, and had produced over 1,500 documents. But rather than denying the Colemans' motion on the grounds that it was overly burdensome, the district court stated:
 
 
 32
 I'm going to at this time deny the motion finding on this record that what is sought is really information relative to a procedure that has been identified as a test procedure being used on a relatively short-time based on counsel's statement on this record. I'm relying on that and finding that if it were [to] be introduced into this record it would be speculative at best based on what I presently have before me. It is a matter that could be brought back if deemed appropriate. From what I have now it's a different situation, a different setting, really a different population.
 
 
 33
 (Tr. 12-13, Nov. 27, 1990.) Thus, we must restrict our examination to this rationale in determining whether it was an abuse of discretion to deny the Colemans' discovery motion.
 
 
 34
 It is axiomatic that the "discovery of evidence, whether hearsay or not, is permitted if it is at all possible that it will lead to the discovery of admissible evidence." 4 James Wm. Moore, Moore's Federal Practice Sec. 26.56. Further, as we have previously noted, "[t]he scope of discovery is not limited to admissible evidence, but encompasses 'any matter, not privileged, which is relevant to the subject matter involved in the pending action.' " Marshall v. Bramer, 828 F.2d 355, 357-58 (6th Cir.1987) (quoting Fed.R.Civ.P. 26(b)(1)). A court is not permitted to preclude the discovery of arguably relevant information solely because, if the information were introduced at trial, it would be "speculative" at best. Accordingly, we find that it was an abuse of the district court's discretion to deny the Colemans' motion.
 
 
 35
 As to their second claim, the Colemans argue that the district court committed reversible error when it failed to consider and balance the elements enumerated in Federal Rule of Civil Procedure 26(b)(1)[4] in ruling that they were precluded from obtaining discovery of documents located at the Red Cross' national headquarters.[5] The Red Cross objected to this request on the basis of it being overly burdensome, since the request would have required the Red Cross to search every file that exists at National Headquarters for any documents that might be of any relevance to any matter in the case. The Red Cross also argued that the hundreds of interrogatory responses, numerous depositions, and thousands of pages of documents that already had been produced were sufficient. The district court agreed with the Red Cross, and denied the motion because it found it overly burdensome. We find nothing in the record that indicates that the district court abused its discretion in refusing to grant this request.
 
 
 36
 For the reasons stated, we AFFIRM in part, REVERSE in part, and REMAND.
 
 
 37
 RYAN, Circuit Judge, dissenting.
 
 
 38
 The only issue in this case is whether the district court abused its discretion in dismissing Cheryl Coleman's lawsuit[1] as a sanction for her counsel's intentional disobedience of the court's protective order or, stated differently, whether dismissal was within the range of sanction options available to the district court. Plainly it was, and therefore, I respectfully dissent.
 
 I.
 
 39
 The district court offered three legal bases for its action: 1) Fed.R.Civ.P. 41(b); 2) the court's inherent power; and 3) Fed.R.Civ.P. 37(b). In its extensive written opinion, the district court provided a reasoned analysis and cited case authority to support its action on each of these grounds. The majority opinion, in holding that the district court abused its discretion in dismissing the plaintiff's case, analyzes the defendants' appeal under Rules 41(b) and 37(b) only. Although Rule 37(b) is nowhere cited in the majority opinion, a number of cases interpreting Rule 37(b) are cited, and the court's opinion seems to turn on a perceived absence of prejudice to the defendants, a factor derived from Rule 37(b) jurisprudence.
 
 
 40
 In my judgment, the majority's apparent conclusion that neither Rule 41(b) nor Rule 37(b) authorize the dismissal sanction the district court imposed misses the point, because neither Rule 41(b) nor Rule 37(b) are the proper bases for resolving this case. This is a case about the sanctions that are available to a district court for the violation of its protective order. Rules 41(b) and 37(b) have nothing to do with protective orders. It is understandable, however, that the majority relies upon Rule 41(b) and Rule 37(b) to analyze the case, because the district court itself relied, in part, upon those rules for its decision. But it also explicitly relied upon its inherent power, and cited Marrocco v. General Motors Corp., 966 F.2d 220 (7th Cir.1992), in which the Seventh Circuit affirmed a district court's dismissal of a plaintiff's case as a sanction for violation of a protective order.II.
 
 
 41
 Rule 41(b) deals primarily with motions to dismiss for want of prosecution. Societe Internationale Pour Participations Industrielles v. Rogers, 357 U.S. 197, 206-07, 78 S.Ct. 1087, 1092-93, 2 L.Ed.2d 1255 (1958). There was no want of prosecution in this case; to the contrary, the problem is that the plaintiff's counsel prosecuted too zealously, indeed contumaciously.
 
 
 42
 Rule 37(b) is primarily concerned with sanctions for failure to conduct or to cooperate in discovery. The text of Rule 37(b) refers to the situations in which it applies, and they include discovery orders pursuant to Rule 26(f). Nowhere does the rule mention protective orders or Rule 26(c), which is concerned with protective orders. Thus, neither Rule 41(b) nor Rule 37(b) are the proper bases for resolving this case.
 
 
 43
 Rule 37(b), upon which the district court relied, in part, and upon which the majority appears to have heavily relied, judging from its "prejudice" analysis, is singularly inappropriate authority for determining whether dismissal was an option available to the district court as a sanction for the violation of its protective order. For example, the four-factor test, and particularly the prejudice factor adopted by a number of courts including the district court in this case, for testing whether dismissal was a proper sanction under Rule 37(b), simply does not fit protective orders.
 
 
 44
 In analyzing the prejudice factor of the test, a few courts have held that whatever sanction under Rule 37(b) a district court selects must relate directly to the prejudice suffered. The rationale, of course, is that because discovery orders usually apply to the moving party's attempt to procure discovery with respect to a particular claim or defense, it is fairly easy to relate the misconduct to a narrowly tailored sanction. If the disobedient party has refused to cooperate in discovery relating to a particular claim, a proper and adequate sanction might include striking that claim. The majority opinion has relied heavily on this analysis, apparently failing to recognize that misconduct and sanction do not coincide so neatly when a protective order is violated. That is because a protective order rarely relates directly to a single claim or defense. Protective orders more often deal with such amorphous concerns as "embarrassment [or] oppression," Fed.R.Civ.P. 26(c), or broader considerations of public policy such as not discouraging blood donations.
 
 III.
 
 45
 The proper approach to determining whether dismissal was within the range of sanctions available to the district court in this case is an analysis of the district court's inherent power. Although the district court relied, mistakenly in my view, upon Rule 41(b) and Rule 37(b) for its authority to act, it also explicitly relied upon its own inherent power. As the Supreme Court has recognized, "[t]he inherent powers of federal courts are those which 'are necessary to the exercise of all others.' " Roadway Express, Inc. v. Piper, 447 U.S. 752, 764, 100 S.Ct. 2455, 2463, 65 L.Ed.2d 488 (1980) (quoting United States v. Hudson, 7 Cranch 32, 34, 11 U.S. 32, 3 L.Ed. 259, (1812)). The exercise of such powers is paramount to the court's ability to " 'protect[ ] the due and orderly administration of justice and ... maintain[ ] the authority and dignity of the court.' " Id. (quoting Cooke v. United States, 267 U.S. 517, 539, 45 S.Ct. 390, 395-96, 69 L.Ed. 767 (1925)). Federal procedural rules do not displace the power, because such enactments,
 
 
 46
 taken alone or together, are not substitutes for the inherent power, for that power is both broader and narrower than other means of imposing sanctions.... [W]hereas each of the other mechanisms reaches only certain individuals or conduct, the inherent power extends to a full range of litigation abuses.
 
 
 47
 Chambers v. NASCO, Inc., 501 U.S. 32, ----, 111 S.Ct. 2123, 2134, 115 L.Ed.2d 27 (1991). However, "[b]ecause inherent powers are shielded from direct democratic controls, they must be exercised with restraint and discretion." Roadway Express, 447 U.S. at 764, 100 S.Ct. at 2463.
 
 
 48
 This court has held that dismissal pursuant to the court's inherent power must be reserved to cases involving " 'contumacious conduct' " or other flagrant abuses. Consolidation Coal Co. v. Gooding, 703 F.2d 230, 233 (6th Cir.1983)(citation omitted). And, we recognized long ago that a trial court's inherent power includes a remedy of dismissal in cases such as this. Reid v. Prentice-Hall, Inc., 261 F.2d 700, 701 (6th Cir.1958). As the Seventh Circuit opined in Marrocco, whose facts parallel the facts here, "wilful and unexcused violations of the protective order here certainly qualify as 'contumacious conduct.' " 966 F.2d at 224. To hold litigants to a lesser standard places the authority and dignity of the court at peril. Of all this, the majority opinion makes no mention whatever.
 
 IV.
 
 49
 Part of the majority's rationale for concluding that the district court abused its discretion in dismissing the plaintiff's case, is the majority's view that the sins of plaintiff's counsel may not be visited upon the plaintiff. Although the majority opinion cites cases from this and other courts for the view that "this court, like many others, has been extremely reluctant to uphold the dismissal of a case merely to discipline an attorney," maj. op. at 5, none of the cited cases involve violation of a protective order. Moreover, dismissal was not ordered here "merely to discipline an attorney." It was ordered primarily to vindicate the authority of the federal judiciary by demonstrating that severe consequences flow to a party whose counsel deliberately and intentionally flaunts a court's protective order for the purpose of gaining advantage in the litigation through a means explicitly prohibited by the court.
 
 
 50
 But whatever the "reluctan[ce]" of a panel of this and other courts to uphold dismissal as a sanction for violation of a court's order, the Supreme Court has decided unequivocally that dismissal is a proper sanction for the misconduct of counsel without regard to the asserted innocence of the client:
 
 
 51
 There is certainly no merit to the contention that dismissal of petitioner's claim because of his counsel's unexcused conduct imposes an unjust penalty on the client. Petitioner voluntarily chose this attorney as his representative in the action, and he cannot now avoid the consequences of the acts or omissions of this freely selected agent. Any other notion would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer-agent and is considered to have "notice of all facts, notice of which can be charged upon the attorney."
 
 
 52
 Link v. Wabash R.R. Co., 370 U.S. 626, 633-34, 82 S.Ct. 1386, 1390, 8 L.Ed.2d 734 (1962)(citation omitted). Undoubtedly, there are cases, although they ought to be few, in which the contumacious conduct of the lawyer should not be attributed to the client. Such cases might include instances where the lawyer's misconduct was personal and independent of, or even contrary to, the client's interest; as, for example, where counsel's deportment in the courtroom is seriously intemperate or insolent toward the court, the jury, or fellow counsel; or where through culpable neglect, and contrary to the client's interest, counsel fails to advance the client's cause through discovery and pretrial procedures; and other such circumstances where counsel's misconduct is entirely personal and in no significant way advantages his client's cause.
 
 
 53
 But this is not such a case. Here, for purposes of enhancing Cheryl Coleman's prospects for recovering substantial money damages against the blood donor--and undoubtedly to apply further leverage against the collectible Red Cross--her lawyer deliberately disobeyed the court's order not to reveal the identity of the donor. To say that counsel's misconduct may not, as things are turning out, benefit Cheryl Coleman because the donor has expired, is irrelevant. Counsel's purpose was to benefit his client by increasing her prospects for a financially advantageous settlement or judgment, and, not incidentally, to benefit himself as well. And therein lies a disquieting reality demonstrating that counsel's deliberate disobedience of the court's order was not at all attenuated from his client's interest.
 
 
 54
 It is safe to assume that counsel's representation of Cheryl Coleman is on a contingent fee basis, the virtually universal arrangement in this country according to which plaintiff's counsel accept the representation of clients in negligence actions. Assuming the usual arrangement here, Cheryl Coleman and her attorney are joint business venturers in the prosecution of Cheryl Coleman's negligence action. Counsel brings to their joint enterprise his professional expertise, and Cheryl Coleman brings a cause of action for negligence--one conceivably worth a great deal of money, given the tragic consequences Coleman has suffered. Cheryl Coleman and her counsel share a financial incentive for counsel to disregard the court's order not to seek or to reveal, to an investigator for example, the identity of the blood donor. Plaintiff and her counsel will share, according to the terms of their contingent fee arrangement, whatever settlement or judgment may be realized against the Red Cross and the donor. Such judgment or settlement may very well be substantially enhanced by the public disclosure of the donor's identity, given the Red Cross's obvious interest in avoiding a jury's potential wrath on learning that the Red Cross has revealed a donor's identity.
 
 
 55
 Quite aside from the financial advantage Cheryl Coleman's attorney intended would result to his client and to himself as a result of counsel's misconduct, there is a failure of logic in the majority's argument that all of the professionally proper actions taken by counsel to advance Coleman's cause should redound to her benefit, but counsel's misconduct directed to the same purpose is attributable to him alone and not to his client. It is not surprising that the Supreme Court flatly rejected this reasoning in Link, 370 U.S. 626, 82 S.Ct. 1386, 8 L.Ed.2d 734.
 
 V.
 
 56
 As I have said, I think the majority opinion mistakenly follows the district court's error in analyzing this case under Rule 41(b) and Rule 37(b). But the district court also relied upon its inherent power, a basis the majority ignores. There is a compelling, indeed binding, legal authority, see Link, 370 U.S. 626, 82 S.Ct. 1386, 8 L.Ed.2d 734, to say nothing of judicial common sense, to support the conclusion that dismissal of the plaintiff's case was within the range of options available to the district court for dealing with counsel's misconduct.
 
 
 57
 It may be that the judges of this panel would have elected a different sanction, one directed exclusively at counsel. But we are not empowered to second-guess the district court's discretion. We owe the district court deference to its discretionary call unless we are able to conclude that it had no authority to act as it did; that, as a matter of law, dismissal was not an option available to the court. This the court cannot do since, plainly, the law is to the contrary. Id. But even if the Rule 41(b) and Rule 37(b) approach were correct, the majority opinion cites no authority for its conclusion that unless the Red Cross can articulate how it was prejudiced in this litigation, it was an abuse of discretion to dismiss the case; and understandably so, for until today, there was none.
 
 
 58
 I would affirm the judgment of dismissal.
 
 
 
 *
 Judge Ryan would grant rehearing for reasons stated in his dissent
 
 
 [1]
 The dissent would decide this case based upon an inherent power analysis and takes issue with our analysis under Rules 41(b) and 37(b). We do not dispute a court's inherent power to dismiss a case; however, we note, as other circuits have found, that the factors considered when reviewing a dismissal under Rule 41(b), Rule 37(b), or a court's inherent power are largely the same. See, e.g., United States v. Shaffer Equip. Co., 11 F.3d 450, 462 (4th Cir.1993) (listing six factors a court should consider before exercising its inherent power to dismiss a case, including the prejudice to the victim); Halaco Eng'g Co. v. Costle, 843 F.2d 376, 380 (9th Cir.1988) ("Dismissals under a court's inherent powers are subject to much the same considerations as those under the Federal Rules of Civil Procedure."). Therefore, even if we were to make an inherent power analysis, our holding would not change
 
 
 [2]
 On August 27, 1992, following our previous decision, which held that the district court had abused its discretion by enjoining the Colemans from bringing a second action against the donor, the Detroit Free Press published an article describing the case and the opinion of this court under the headline "Pair Can Sue Donor of AIDS Blood."
 
 
 [3]
 The donor involved in this case is now deceased
 
 
 [4]
 Federal Rule of Civil Procedure 26(b)(1) provides:
 The frequency or extent of use of the discovery methods set forth in subdivision (a) shall be limited by the court if it determines that ... (iii) the discovery is unduly burdensome or expensive, taking into account the needs of the case, the amount in controversy, limitations on the parties' resources, and the importance of the issues at stake in the litigation.
 
 
 [5]
 The Colemans sought information by way of interrogatories and document requests that included the following: (1) identification and production of documents relating to the decision to implement and relating to the use of the hepatitis B core antibody test in Central Region; (2) identification and production of documents relating to a December 1983 meeting which discussed the use of the hepatitis B core antibody test to screen blood; (3) documents relating to the use of a screening procedure whereby donors could designate their blood for non-transfusion or laboratory use; (4) documents which discussed the plasma industry's decision to exclude homosexuals from the donor pool; and (5) documents relating to donors sexual orientation as part of donor screening
 
 
 [1]
 I recognize that Cheryl Coleman's husband, Gerry Coleman, has a derivative claim and that he, too, is a plaintiff